J-S26031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| S.S. | : | No. 3660 EDA 2018 |

Appeal from the Order Entered November 19, 2018
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  0C1600924

BEFORE:   PANELLA, P.J., GANTMAN, P.J.E., and PELLEGRINI*, J.

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JULY 1, 2019**

M.S. (Mother) appeals from the order of the Court of Common Pleas of Philadelphia County (trial court) awarding Mother and S.S. (Father) shared legal and physical custody with respect to their daughters Sc.S. and Sa.S. (Children).  Upon careful review, we affirm.

Sc.S. was born in February 2011 and Sa.S. was born in September 2013.  In July 2016, Mother and Children left the marital residence due to an incident of domestic abuse perpetrated by Father upon Mother.[1]  Mother filed

_____

[1] In an e-mail to Mother dated July 19, 2016, Father acknowledged "a pattern of my consistent aggression and abuse starting a [] long time ago" and summarized the July 2016 incident as follows:

> After trying to force you to stop folding the clothes I threw the socks in your face, I threw the laundry basket at your face, I took

_____

\*   Retired Senior Judge assigned to the Superior Court.

a complaint for custody and on September 22, 2016, the parties entered into an agreed custody order providing Mother and Father with shared legal custody, Mother primary physical custody, and Father partial physical custody for one overnight per week as well as two to three hours after school on two additional days per week. The order also provided Father additional periods of partial physical custody as agreed by the parties.

In December 2016, Mother and Children returned to the marital residence. The family lived together until February 2018 when Mother and Father separated for a second and final time. On February 12, 2018, Father filed a petition to modify custody seeking a shared physical custody arrangement.[2]

## I.

Before we begin, to better understand what follows, it is worthwhile to set forth the well-settled law regarding custody disputes. The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that

_____

> your clothes out of the closet[,] threw them all over the house in a rage that caused you to run upstairs and then [I] grabbed you and pulled you out of the closet[,] grabbed you by the throat[,] choked you and told you that I would kill you . . . all with our children downstairs sleeping.

Mother's Exhibit M-9 (ellipses in the original).

[2] Father's petition is not contained in the certified record.

legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well[-]being." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa. Super. 2006), *citing* **Arnold v. Arnold**, 847 A.2d 674, 677 (Pa. Super. 2004).

Child custody actions are governed by the Child Custody Act, 23 Pa.C.S. §§ 5321-5340. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S. § 5338. Section 5328(a) sets forth sixteen factors to be used in determining what custody arrangements are in the best interest of the child. **See E.D. v. M.P.**, 33 A.3d 73, 80-81, n.2 (Pa. Super. 2011). Trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order." **J.R.M. v. J.E.A.**, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original); **see also A.V. v. S.T.**, 87 A.3d 818, 823 (Pa. Super. 2014) (providing that trial courts shall set forth the mandatory assessment of the Section 5328(a) best interest factors "prior to the deadline by which a litigant must file a notice of appeal") (citation omitted).

## II.

On November 19, 2018, the trial court conducted a custody trial on Father's petition to modify custody. Mother and Father both testified. The court also conducted an *in camera* interview of Children.

Mother and Father live approximately two miles away from each other, with Children's schools a quarter mile from Father's house and less than two miles from Mother's home. Father works from home and testified that he

works throughout the day, "a few two to three-hour shifts during the day." N.T., 11/19/18, at 7.[3] Mother works as a Reiki healer and a babysitter. Both Mother and Father testified to schedules that provide flexibility for childcare.[4]

Father testified that he and Mother first separated in the summer of 2016 when Mother left the marital residence. At that time, Mother took Children with her. Father insisted that there was no agreement that Mother would take the children with her. Father testified that he agreed to the September 2016 custody order to attempt to bring the family back together and to create peace because there was a lot of fighting. Mother and Father then reconciled in December 2016 and Mother returned to the marital home with Children. Following Mother's return, Mother worked evenings as a babysitter from 7 p.m. to 3 a.m., two to five times a week. While Mother worked, Father testified that he cared for Children, including taking Children to school in the morning.

Mother moved out of the marital home again in early February 2018. Although he also acknowledged that he may have asked her to leave during an argument in November 2017, Father claimed to be unaware of Mother's

---

[3] Mother, through counsel, also expressed concerns that Father had Airbnb guests in his home while Children were there. N.T., 11/19/18, at 9-10. Father agreed to limit such guests to non-custodial periods. *Id.* at 13-14.

[4] On cross-examination, Father acknowledged that he went on several work-related trips. N.T., 11/19/18, at 67-73.

plan to move out until she did so. After Mother left the second time, the parties began following the September 2016 custody order, which Father testified was:

> not how we had been conducting our life. I was at home with the kids. I was taking them to school. I was at home with them in the evenings. I would give them baths. Sometimes we would hand it off back and forth. But that was . . . from December of 2016 until February of 2018. I was taking care of the kids with her in the home.

*Id.* at 31-32.

Further, Father and Mother had disagreements regarding custody, with Father explaining Mother:

> wanted to pick [Children] up at six. I was saying 6:30 because [the custody order] said two to three hours after school. I was asking for days to have times with them. She was saying no and then disagreeing with me on the times and days. And then, also, the agreement stated that we could agree on more custody. And she would not agree to any further custody. . . .

*Id.* at 32-33.

Father asserted that he and Mother could communicate about Children, but that when Children are in Mother's custody, Children are not able to regularly communicate with him. Father testified that he attempts to call Mother to speak with Children and Mother generally does not answer, and when she does answer, she gets on the phone and argues with Father before hanging up the phone. Accordingly, Father and Mother mainly communicate by text message, although Father noted that Mother belatedly responds to the text messages and typically does not communicate about the requested issue.

Custody exchanges between Father and Mother occur at a police station. Father testified that he typically stays in the car at the exchanges and noted multiple times that when Mother came up to the car, that "[s]ometimes there will be arguments. Sometimes we won't talk at all."

Father authenticated a number of text messages and e-mails involving disputes between Mother and himself, including text messages where he acknowledged referring to Mother as a "vindictive b***h". *Id.* at 79-83. Father denied this occurred in front of Children. Father acknowledged that he told Mother that she could not come to Sa.S.'s birthday party, but claimed that Mother told him he could not attend Sc.S.'s birthday party, noting that, in the end, Mother, in fact, attended Sa.S.'s party. Further, he testified to various disputes regarding camp, schooling and activities. By way of example, Children currently go to schools within Father's neighborhood and are doing well in school, but after Mother left, Mother informed Father that she would switch their schools.

With respect to his care for Children, Father asserted that he does homework, works on math problems, and prepares meals for them. Father testified that he would be able to administer medication for Sc.S.'s thyroid condition, but noted that Mother does not send Sc.S. with her medication, although he also has the medication at his house. Father claimed that Mother currently takes Children to the pediatrician, but while the family was intact, both Mother and Father took them. Father testified that Mother did not notify

him of the appointments. Father asserted that he had a great relationship with Children.

Mother offered testimony that was at odds with Father's testimony. Mother testified that she returned to the home in December 2016 because Father suggested that if she moved back into the home, Father would move out. She left the home in February 2018 when Father "pulled a knife out and threatened to stab himself with both hands, holding the knife into his chest. So, the next day I told him I wasn't spending another night there." *Id.* at 114.

Mother testified that while Mother and Father lived together, she worked as a babysitter from 9 p.m. until 2 a.m. three days a week. Mother claimed that when she worked, she put Children to bed and brought them to school in the morning because she asked Father to help her and he refused. Mother testified that she also had her family[5] assist her with childcare when she was holding Reiki classes because Father refused. Further, Mother testified that she was unable to pursue additional education because Father would not come home to care for Children. Mother asserted that she was responsible for making doctor's appointments, putting Children to sleep, and staying home with them when they were sick. She also asserted that she filled Sc.S.'s

_____

[5] Mother testified that she has a great deal of family in the area. N.T., 11/19/18, at 141.

prescription and that Father never did. Similarly, Mother testified that she does homework with Children but Father does not. Additionally, she noted that Father signed Children up for activities without asking her. Mother insisted that she did not deny Father access to Children. Mother recalled that she offered Father additional time with Children and he refused.

With respect to Father's abuse, Mother testified to the July 2016 incident where Father grabbed her by the throat, noting that she was injured and sought treatment as a result. Mother also testified regarding an incident involving Father in April 2018 that occurred after she dropped Sa.S. off at school. Mother recalled that Father followed her car very closely and when Mother would have to stop, Father would slam on his brakes like he was going to crash into her. Mother pulled into a parking lot and Father got out and was yelling at Mother, banging on the windows and trying to open the doors. *Id.* at 131-32. Mother testified that she filed a police report and a Protection from Abuse (PFA) action but decided to withdraw the PFA because "it appeared to--the situation was improving. The pickups and drop offs. He stopped showing up at my house. And I wanted to have a smoother--just for the girls' interaction. Like being able to do the drop offs and pick ups." *Id.* at 132-33.

Mother also testified that Father would enter her apartment building through a front door that did not lock. He would then bang on her door. She believed Father did this four times and his demeanor was aggressive and angry. Mother testified that on one occasion at her apartment, Father pushed

her down. Mother asserted that during exchanges at the police station, Father called her names such as "garbage maggot." **Id.** at 138-39.

Following Mother's and Father's testimony, the court conducted an *in camera* interview with Children. On November 19, 2018, the trial court entered its custody order. As it relates to Mother's appeal, the order provided the parties shared legal custody; shared physical custody based on a week-on/week-off schedule; allowed the non-custodial parent an overnight from Wednesday to Thursday; and provided that if Father hosted an Airbnb guest, the court would schedule a contempt hearing. Order, 11/19/18, at 1-2.

On December 18, 2018, Mother, acting *pro se*, timely filed a notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On January 18, 2019, the trial court filed its Rule 1925(a) opinion.

In its opinion, the trial court addressed all of the best interest factors in Section 5328(a).[6] As it relates to Mother's issues on appeal, the court made the following findings:

---

[6] Mother does not challenge the trial court's findings with respect to factor six, the child's sibling relationships; factor ten, which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child; factor eleven, the proximity of the residences of the parties; factor fourteen, the history of drug or alcohol abuse of a party or member of a party's household; and factor fifteen, the mental and physical condition of a party or member of a party's household. The trial court determined these factors were either not applicable or did not favor either party.

1. Which party is more likely to encourage and permit frequent and continuing contact between the children and another party. Conflicting testimony was given concerning communication between Father and Children. Father testified credibly that he often had difficulty getting in touch with Mother because Mother often did not answer her phone and Mother's voice mailbox was frequently full. (N.T. November 19, 2018; p. 35, p. 97). Exhibits containing copies of partial text message conversations between Father and Mother were admitted by Mother in an attempt to bolster Mother's argument that Father was demanding and/or imposing on her custodial time. *Id.* at 97-101. The Exhibits are merely snippets of conversation that do not provide evidence of the alleged prolonged back and forth communication over extended periods of time and thus fail to demonstrate any pattern or habit between the parties. The trial court found Father's testimony credible that he was just trying to talk to Children on a regular basis. *Id.* at 97. This contention is further supported by [F]ather's request to have a specific time for the non-custodial parent to talk to Children each day. Father stated that he would extend the same courtesy to Mother when Children are in Father's custody as Father believes Children should have access to both parents each day. *Id.* at 56-57.

Father testified credibly that he frequently asked for additional time with Children, but only received additional time on a few rare occasions after repeated requests. (N.T. November 19, 2018; p. 37). Father mentioned numerous times in his testimony that he wants Children to have access to both their parents as he feels that is in Children's best interest. *Id.* at p. 57; 64; 65; 66. Mother downplayed Father's role in Children's lives. Mother testified that Father only occasionally took Children to school and put them to bed and Father would refuse to come home and watch Children when the parties lived together. *Id.* at p. 116; 119. While there is no doubt that Mother has been active in Children's lives, the trial court found Mother's testimony about Father's lack of involvement with the children incredible. Mother testified that after the parties' separation in February she offered to let Father have Children for a week, and stated in text messages sent after the separation in February that Children were asking for Father. Both these scenarios would be unlikely with an uninvolved parent. *Id.* at p. 114; and 91. Father, and not Mother, demonstrated a greater understanding of encouraging and permitting communication and contact between Children and both parents.

2. The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the children or an abused party and which party can better provide adequate physical safeguards and supervision of the children.

Mother testified about an incident that happened between Mother and Father in July of 2016. Mother testified that she moved out of the marital home because "He strangled me and asked me if I wanted to die." (N.T. November 19, 2018; p. 120). The next day after this incident Mother moved in with her mother. *Id.* Father visited Mother and Children at maternal grandmother's home. *Id.* Mother later asked Father to take Mother and Children to Mother's grandfather's house in New Jersey, but Father suggested she move in with Mother's cousins in Philadelphia. Father took Mother and Children there. *Id.* at p. 120-121. After living with Mother's cousins from August 2016 to December of 2016, Mother and Children moved back in to the marital residence with Father. Mother's attorney provided an email from Father that described the abusive incident in detail. *Id.* at p. 123. Father admitted what happened on July 16, 2016 and outlined what he (Father) was going to do to correct the situation. After reading the text message in part on the record, it was entered without objection from Father's counsel. *Id.* at p. 122-123.

Mother testified about a second incident that took place on April 5, 2018. The incident involved alleged aggressive driving by Father, Father following Mother's car in his car, and Father using his vehicle to block in Mother's vehicle at a parking lot. (N.T. November 19, 2018; p. 130-133). It should be noted that the incident occurred after the child Sa.S was dropped off at school and no mention of Sc.S was made; the children were apparently not present during the alleged incident. *Id.* at p. 131. Mother obtained a temporary *ex-parte* protection from abuse order. *Id.* Mother testified that she later withdrew her petition for the protection from abuse order because, "Well, it appeared to --- the situation was improving. The pickups and drop offs. He stopped showing up at my house. And I wanted to have a smoother -- just for the girls' interaction. Like being able to do the drop offs and pickups." *Id.*

While both these incidents gave the trial court pause, the trial court did not find a pattern of abuse, nor a risk of continued harm to Mother or Children. Based on Mother's testimony[,] Mother

returned to the marital residence with Children after the first incident and withdrew her petition for a protection from abuse order after the second incident. (N.T. November 19, 2018; p. 119-120; p. 133). Hostility between Mother and Father at custodial exchanges remain, but is diminishing. The trial court concluded from the totality of the parties' testimony and Children's *in camera* interviews that the hostility is mutual, but decreasing in frequency. The parties were ordered to attend co-parenting classes[7] to help alleviate the remaining hostility, and the custodial exchanges not a[t] school or camp remain at a police district as an additional precaution.

3. The parental duties performed by each party on behalf of the children.

Mother testified credibly that she takes Children to school and doctor's appointments, stays home with Children when they are sick, and puts them to bed at night. (N.T. November 19, 2018; p. 125). Father testified credibly that while the parties cohabitated from December of 2016 to February of 2018 the parties shared the responsibility of Children. *Id.* at p. 31-32. Father was at home with Children, took Children to school, and gave Children baths. *Id.* at 31. Father stated that during Father's partial physical custody on weekdays he does homework with Children, but because of the limited time and afterschool activities, homework was not always completed before Father has to return the Children at 6:30 pm. Therefore, Children sometimes have to finish homework at Mother's home. *Id.* at 36. Father also prepares meals for Children. *Id.* at p. 65. Both Mother and Father have performed extensive parental duties for Children and are equally capable of caring for Children on a daily basis.

---

[7] Although Mother, in her concise statement of errors complained of on appeal, asserted that the court erred by ordering co-parenting counseling "despite the evidence of [Father]'s physical and verbal abuse to [Mother] which includes strangulation," Mother does not pursue this argument in her brief. *See* Concise Statement of Errors Complained of on Appeal, at ¶ 5; Mother's brief at 1-40. Accordingly, we find this issue waived. *See Krebs v. United Ref. Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).

4. The need for stability and continuity in the children's education family life and community life.

The parties live in close proximity to one another. Children attend the same school and have access to the same activities at both homes. (N.T. November 19, 2018; p. 25-26). The prior custodial arrangement gave Mother primary physical custody and Father partial physical custody as follows: Tuesday and Wednesday from after school until 6:30pm; every other Friday from 3:30pm to Saturday at 6:00pm, and every other Saturday from 3:30pm to Sunday at 6:00pm. The trial court found the frequent exchanges cumbersome and the sporadic time to Father disruptive to the stability and continuity of the Children's education, family life and community life. The alternating Saturday-Sunday physical custodial arrangement had Children moving between Mother['s] and Father's homes every weekend and left no weekend intact for Children. With the shared physical custody arrangement Children can spend quality time with each parent without the burdensome shift of custody every weekend, and the frequent custodial exchanges from Mother's home, to school, to Father's home, and then the police station for the final exchange back to Mother's home two days a week. The current Order allows each parent to have alternate weekends and custodial exchanges are limited. There is only one weekly custodial exchange that is not scheduled at school or camp (where the parties do not need to interact) and that exchange occurs at a police station. (*See* Order dated November 19, 2018).

5. The availability of extended family.

Mother has extended family in Philadelphia that she sees on a regular basis, and the extended family is readily available to help Mother with Children. (N.T. November 19, 2018; p. 141-142). Father's extended family lives in Syracuse, New York. Father and Children visit extended family a couple of times a year. *Id.* at 53-54.

\*\*\*

7. The well-reasoned preference of the children, based on the children's maturity and judgment.

Children are able to distinguish the difference between a truth and a lie, and were duly sworn. Children were interviewed separately

*in camera* and their testimony was sealed. Children expressed a desire to spend equal time with their parents. Neither child is fearful of Mother or Father. (*See* Sealed Child Interview, November 19, 2018).

8. The attempts of a party to turn the children against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

No evidence was presented at trial that was relevant to this factor.

9. Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the children adequate for the children's emotional needs.

Neither party presented evidence that would make one party more likely than the other to maintain a loving, stable, consistent and nurturing relationship with Children.

\*\*\*

12. Each party's availability to care for the children or ability to make appropriate child-care arrangements.

Father works from home, has a flexible schedule, and can make appropriate child-care arrangements if needed. (N.T. November 19, 2018; p. 7; 39; 159). Mother testified that she is regularly available to Children. *Id.* at p. 142.

13. The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's efforts to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with the party.

Mother and Father continue to struggle with communication regarding Children. Mother asserted that Father is the aggressor and screams and yells at custodial exchanges, but when specifically question[ed] on cross-examination, Mother indicated that Father did not leave the car during exchanges and did not always have the car window down. Although Mother denied yelling at exchanges, she failed to address how Father could yell and scream in a sealed car that he never left. (N.T. November 19, 2018; p. 138-139; p. 149-150). Father was honest and testified that communication was difficult because the parties

- 14 -

argue. *Id.* at p. 56; 58; 86. Father testified that he is willing to go to co-parent counseling because "I think it would be good for both of us. I want the girls to have the best chance of a healthy relationship between their parents." *Id.* at p. 57. In addition to communication difficulties[,] the parties are making unilateral decisions without discussing the options with each other. Father signed Children up for jujitsu and gymnastics without consulting Mother. *Id.* at p. 137. Mother signed Children up for camp without discussing options with Father. *Id.* at p. 127. The trial court ordered co-parenting classes in an attempt to alleviate the hostility between the parties, and help them arrive at legal decision[s] on behalf of Children together. Under the shared custody arrangement ordered by the court, custodial exchange[s] are limited to twice a week with one exchange[] made at school/camp (no party interaction) and the other weekly exchange is at the police station. (*See* Order dated November 19, 2018).

\*\*\*

16. Any other factor.

Mother and the tr[ia]l court raised concern over Father's practice of contracting with Airbnb. Father's attorney stated on the record that it was brought to Father's attention that Mother did not want Airbnb guests in Father's home when the children were present. (N.T. November 19, 2018; p. 13.[)] Father's attorney further stated that, "So, he understands Mom's concern. He is absolutely one-hundred present willing to ensure moving forward that there are no Airbnb people there when he has the children." *Id.* at 13-14. The trial court reiterated Mom's concern and addressed it on the record and in the custody order. On the record the trial court stated that Airbnb guest[s] were not allowed overnights when Children were present and that the trial court considered such action "putting the children at risk." *Id.* at p. 24. The trial court cautioned that Father would lose his time with Children if he had "one single Airbnb." *Id.* at p. 16. The trial court order dated November 19, 2018 solidified the issue by stating that proof of an Airbnb guest during Father's custodial time would be considered grounds for [] contempt. (*See* Order dated November 19, 2018).

Trial Court Opinion, 1/18/19, at 4-12.

**III.**

On appeal, Mother raises the following issues for our review:

A. Did the [t]rial [c]ourt err in failing to consider and state findings regarding the custody factors enumerated in 23 Pa.C.S. § 5328?

B. Did the [t]rial [c]ourt abuse its discretion when it limited Mother's testimony and excluded her evidence regarding Father's abuse?

C. Did the [t]rial [c]ourt abuse its discretion in failing to properly consider and weigh the evidence of Father's physical and verbal abuse of Mother in making a custody determination?

D. Did the [t]rial [c]ourt abuse its discretion in failing to properly consider and weigh the relevant custody factors?

E. Did the [t]rial [c]ourt abuse its discretion in modifying physical custody when Father did not meet his burden of proving that modification was in the best interests of the children?

Mother's brief at 4-5 (issues reordered for ease of disposition; trial court and suggested answers omitted).[8]

---

[8] Our standard of review in child custody cases is as follows.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial

**A.**

In her first issue, Mother argues the trial court erred when it failed to set forth its findings with respect to the Section 5328(a) factors until after she was required to file a notice of appeal. Mother argues that pursuant to 23 Pa.C.S. § 5323(d) and associated case law, the mandatory assessment of the best interest factors must be made prior to the deadline by which a litigant must file a notice of appeal.

Mother is correct that the trial court acted in contravention of case law by failing to file an opinion until January 18, 2019. We have held that a trial court in a custody case must file an opinion setting forth the reasons for its decision prior to the expiration of the thirty-day appeal period. *See C.B. v. J.B.*, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013) ("[W]e now hold that section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a)] factors prior to the deadline by which a litigant must file a notice of appeal."). However, it is clear that the court's delay did not prejudice Mother in any way and that

court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

remanding this case for that reason would serve no purpose.[9]  Therefore, we conclude that Mother's first issue does not entitle her to relief.

**B.**

In Mother's second issue, she argues the trial court improperly limited her evidence of Father's abuse, precluding her from presenting evidence of her injuries, and excluding testimony from a police officer.  She asserts that she was unable to testify about the injuries she sustained after Father strangled her and that the trial court improperly precluded photographic evidence regarding Mother's injuries.  Accordingly, Mother asserts that "despite the [t]rial [c]ourt's statement that the abuse had been established, it clearly had not been and additional evidence was necessary on this point." Mother's Brief at 24.  Further, Mother contends that the court improperly excluded the testimony of a police officer without any information regarding the officer's testimony.

---

[9] We acknowledge that the trial court concluded that Mother waived her second issue, finding that Mother's Rule 1925(b) statement was too vague to preserve it.  Presumably, a timely filed opinion would have permitted Mother to file a more precise Rule 1925(b) statement.  As discussed in more detail with respect to Mother's second issue, we conclude that Mother did not waive her second issue because of the vagueness of her Rule 1925(b) statement, and, accordingly, there is no prejudice to Mother.

Initially, the trial court concluded that Mother did not preserve this issue because her Rule 1925(b) statement was too vague.[10] **See** Trial Court Opinion, 1/18/19, at 13. Nevertheless, the trial court addressed this issue as follows.

> If Mother is referring to Father's alleged history of abuse against Mother, see factor 2 above. In regard to the first incident in July of 2016 the trial court allowed Mother to testify, admitted M-9 into evidence, and accepted M-9 as Father's admission to the alleged physical altercation. In determining that there was no continuing risk of harm to Children or an abused party the trial court also took into consideration that Mother asked Father for assistance shortly after the incident and eventually returned to cohabitate with Father in the marital residence with Children. In regard to the second incident in April of 2018, Mother voluntarily withdrew her petition for protection from abuse before an evidentiary hearing was had on the petition. The custody trial on Father's petition to modify physical custody was not the proper venue for an extended evidentiary hearing on an abuse petition that was voluntarily withdrawn by Mother, but Mother was permitted to testify about the incident. In determining there was no continuing risk of harm to Children or an abused party the trial court considered Mother's withdraw[al] of the petition coupled with her testimony that things were improving between the parties.

**Id.** at 14.

Although Mother has honed her argument on appeal to focus on the trial court's alleged exclusion of evidence relating to the harm she suffered at the

---

[10] Mother filed her Rule 1925(b) statement *pro se*, asserting, among other things, "It was an error for the [c]ourt to limit Appellant's testimony and exclude her evidence of abuse in defense of Appellee's petition." Rule 1925(b) Statement. Mother subsequently retained counsel to represent her with respect to this appeal. Father is before this Court *pro se*. He has not filed a brief.

hands of Father, and the purported inability of Mother to call a police officer as a witness, she presents a relatively straightforward issue that is sufficiently preserved in her Rule 1925(b) statement. *See Pennsy Supply, Inc. v. Mumma*, 921 A.2d 1184, 1197 (Pa. Super. 2007) (declining to find waiver with respect to a Rule 1925(b) statement when "the issues raised therein are fairly straightforward and, thus, are not too vague to preclude review.").

With respect to Mother's assertion the trial court precluded Mother from offering photographs or other evidence of her injuries, Mother testified that she had photos, text messages, police reports, "papers from the specialists," and saw a physical therapist, at which point the following interaction occurred.

> THE COURT:  Counsel, unless you have the specialist here, they're not--
>
> [Mother's counsel]:  Okay.  I will stick to the photographs then.
>
> THE COURT:  Thank you.  I don't think there's any denial.  I don't need a photograph.  There's just been no denial.  There's been an admission.
>
> [Mother's counsel]:  Okay.  All right.

N.T., 11/19/18, at 123-124.

Mother's counsel did not pursue the issue further.  Similarly, with respect to the police officer's testimony, the record suggests Mother filed a police report due to Father's behavior during the April 2018 incident where Mother asserted Father aggressively followed her in his car.  During Mother's testimony, she noted that the officer to whom she reported the incident was in the waiting room outside the courtroom.  Following the trial court's *in*

- 20 -

*camera* interview with Children, the court began discussing its resolution of the custody matter. Thereafter, Mother's counsel suggested that she had an additional witness, stating:

> [Mother's counsel]: Your Honor, just so you know, I didn't get to call one of my witnesses. But I -- was never able to call the police officer. He left --
>
> THE COURT: Well, then --
>
> [Mother's counsel]: -- anyway. But --
>
> THE COURT: Well, I don't know what the police officer would have had to say about custody of the children. There was an awful lot of testimony about things between the parties. The children are not afraid of their father. They want to spend more time with their dad. They're not afraid of their mother, thank goodness. . . .

*Id.* at 156-157.

After this discussion, Mother's counsel did not return to this issue. With respect to both issues, we conclude that Mother waived them by her failure to appropriately preserve the issues.

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction . . . one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

***Thompson v. Thompson***, 963 A.2d 474, 475–476 (Pa. Super. 2008) (*quoting* ***Hong v. Pelagatti***, 765 A.2d 1117, 1123 (Pa. Super. 2000)).

Contrary to Mother's argument, the trial court did not preclude Mother from introducing evidence or photographs of her injuries. Counsel agreed to move on with respect to some of Mother's proposed testimony and, with respect to the photographs, after the court suggested it did not need them, counsel did not pursue the issue further. Similarly, Mother's failure to call a purported witness who had already left is insufficient to preserve the issue for appellate review. Accordingly, we conclude that Mother has waived both claims raised in her second issue.

## C.

In Mother's third issue, she asserts that the trial court erred in failing to properly consider and weigh Father's physical and verbal abuse of Mother. Mother argues that the trial court credited Mother's testimony regarding two incidents of abuse, recounting the incidents where Father strangled Mother and followed Mother's vehicle. Mother cites to the protection from abuse statute and contends that the "uncontradicted evidence presented at trial demonstrated that there was a pattern of Father abusing Mother." *Id.* at 15. Mother faults the trial court for focusing on whether Father is a continuing risk to Mother or Children, not whether the abuse occurred, and for failing to consider additional incidents of abuse and name-calling. Mother also contends that the trial court's order that the parties have custody exchanges at a police station is contradictory to its conclusion that Father is not a risk to Mother. Further, Mother claims that the trial court improperly focused on Mother's

withdrawal of the PFA. Mother asserts that the trial court failed to appreciate the extent and severity of Father's violence towards Mother and failed to appropriately weigh that abuse as a factor impacting Children's safety.

It is apparent from the trial court's opinion that the court considered the past abuse committed by Father, as well as whether there is a continued risk of harm to Children or Mother, in arriving at what custody arrangement was in the best interest of the Children. Pursuant to our standard of review and based on the evidence of record, the trial court did not abuse its discretion. Accordingly, Mother's third issue does not merit relief. However, in reaching this conclusion, Father's history of committing abuse against Mother is troubling. Nonetheless, it is well-settled that this Court cannot reverse a trial court's decision merely because the record could also support a different result. **See In re Adoption of T.B.B.**, 835 A.2d 387, 394 (Pa. Super. 2003).

**D.**

Mother's fourth and fifth issues, which we address together, challenge the trial court's analysis and findings with respect to numerous best interest factors.[11] Generally, Mother asserts that the trial court improperly credited Father's testimony, improperly weighed the factors, and improperly enacted

---

[11] Mother asserts the trial court erred in its analysis of factors one, two, three, four, five, seven, eight, nine, twelve, thirteen, and sixteen.

a "drastic" change in the custody arrangement.[12]   Additionally, with respect to the need for stability and continuity in Children's life, Mother asserts that the trial court "did not significantly decrease the number of custodial exchanges in a week from the prior order."  *Id.* at 30.  Moreover, Mother asserts that certain of the court's findings, such as the trial court's findings with respect to the availability of extended family and the parties' ability to provide appropriate childcare for Children, are conclusory.  *Id.* at 32, 34-35. Mother reiterates that the court discounted Father's name-calling as an attempt to turn Children against her and undermine Children's emotional stability and faults the trial court for ignoring that Father chose to have Airbnb guests in his home.  *Id.* at 33-34, 37.

Additionally, Mother asserts that Children were thriving when living primarily with Mother, and that neither Father nor the trial court presented any valid reason for why it is better for the Children to drastically change their

---

[12] The trial court noted that it awarded shared physical custody following its analysis of the mandated factors, and rejected Mother's assertion that the change in physical custody was drastic, reasoning,

> Finally, the "drastic" change in physical custody changed when the parties separated for the final time in February, 2018.  Both parties had cared for Children for more than a year prior to that date.  Thereafter, a temporary agreement was reached in April, 2018 that limited Father's custodial time.  The November 19, 2018 Order restores the joint caretaking and responsibility that both Mother and Father had for Children while the parties cohabitated.

Trial Court Opinion, 1/18/19, at 12-13.

- 24 -

custody. Mother faults the trial court for placing the burden on her to prove that a shared custody arrangement was not in the Children's best interests rather than on Father to prove that changing the custody order would be in their best interests.

Mother's challenges go to the trial court's conclusions and assessments and ask this Court to re-find facts, re-weigh evidence and/or re-assess credibility to her view of the evidence. Under the standard of review applicable in custody matters, we are not permitted to disturb the trial court's findings of fact and determinations regarding credibility and weight of the evidence absent an abuse of discretion. **See C.R.F.**, 45 A.3d at 443; **see also E.R.**, 129 A.3d at 527. As we stated in **Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006) (*quoting* **Jackson v. Beck**, 858 A.2d 1250, 1254 (Pa. Super. 2004)):

> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

Moreover, it is not our function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations, the trial court erred or abused its discretion. . . ." **Hanson v. Hanson**, 878 A.2d 127, 129 (Pa. Super. 2005).

- 25 -

Here, the parties offered divergent testimony regarding numerous issues. Ultimately, it was the trial court's responsibility to make credibility and weight determinations, and we find that the trial court did not err or abuse its discretion in its decision. The trial court adequately and appropriately analyzed the best interest factors pursuant to Section 5328(a), and, after careful review of the record, we determine that the trial court's findings and determinations are supported by competent evidence in the record.

Order affirmed.

President Judge Panella joins the memorandum.

President Judge Emeritus Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/1/19